07-21383.pi3

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No. 07-21383-CIV-COOKE/BROWN

PSC, S.A., et al.,

      Plaintiffs,

vs.

PRICESMART, INC.,

      Defendant.

_____/

### ORDER ON MOTION FOR PRELIMINARY INJUNCTION

**This matter** is before this Court on the Emergency Motion for Temporary Injunction, filed May 30, 2007. The Court has reviewed the Motion, Response, Reply, and all pertinent portions of the file. Additionally, evidentiary hearings were held on June 12, June 13, June 14 and July 31, 2007, and the Court adopts the transcript of those hearings by reference herein.[1]

### Facts

Respondent PriceSmart, Inc. ("PriceSmart"), a Delaware corporation with its principal place of business in San Diego, California owns and operates membership shopping warehouses in Central America and the Caribbean (hereinafter "warehouses"). PriceSmart often operates these warehouses using wholly-owned subsidiaries in each particular country (collectively, the "PriceSmart Entities").

Movants, PSC, S.A. ('PSC"), a Panama corporation, Tecnicard, Inc. ("Tecnicard"), a Florida corporation, and Banco de la Produccion, S.A., ("Banpro"), a banking institution organized and existing under the laws of the Republic of Nicaragua, (collectively, "Promerica") are entities owned by Latin American investors involved in the business of banking and credit card services in Honduras,

_____

[1]References to the transcripts shall state the witness last name, followed by the page number.

Panama, Costa Rica, El Salvador, Nicaragua and the Dominican Republic.

In the late 1990's Promerica and the PriceSmart Entities entered into a joint venture to open and operate warehouses in Central America. In 1998, an entity known as PSMT Caribe was formed, which was a joint venture between PSC (40%) and PriceSmart (60%) that was formed for purposes of locating and acquiring property and establishing and operating the shopping clubs. A separate joint venture, PSMT Nicaragua, was created for development of warehouses in that country.

In June, 2000, PriceSmart and PSC entered into a Stock Purchase Agreement ("SPA"), whereby PriceSmart acquired all of the stock in PSMT Caribe and therefore all of the rights to own and operate the warehouses. In return, PSC received PriceSmart common shares of stock. The SPA provided, *inter alia*, as follows:

> **9.1   Right to Provide Goods or Services.**   PriceSmart agrees that when it is necessary for PriceSmart to purchase goods or services for the warehouse stores operated by PSMT Caribe, which goods or services are supplied or otherwise made available by a shareholder of PSC to the standards required by PriceSmart, such shareholder shall have the right to provide such goods or services if the price and term thereof meets or beats any competitive offer or bid. Upon request by a Shareholder, PriceSmart shall provide such Shareholder with all information reasonably requested by such Shareholder regarding any good or service, including the terms of any competitive offer or bid so long as such disclosure does not violate any confidentiality agreement currently in effect or required by a supplier in the future. ...

> **9.2   Right to Provide In-House Banking and Related Services.**
> PriceSmart agrees, on behalf of itself and its subsidiaries, that Promerica Bank shall have a right, at the option of Promerica Bank, to lease space and to provide in-house banking services from such leased space in PriceSmart warehouses identified on Exhibit D hereto[2], provided that the rates for services charged and lease payments by Promerica Bank are reasonable and generally competitive. In addition, the parties acknowledge that the continued validity of the Credit Card Coissuance Agreement and the related agreements for each of the countries listed in Exhibit D and agree to use their respective best efforts to comply (and cause their affiliates to comply) with the terms and conditions

---

[2]Exhibit D identifies warehouses located in Costa Rica, El Salvador, Honduras and the Dominican Republic.

2

thereof.[3]

PriceSmart also entered into a variety of agreements through the years with PSC and its shareholders so that its members could have access to a dual purpose, co-branded credit card ("co-branded card"), the latest of which was the Agreement to Issue Dual Purpose PriceSmart Visa Cards ("Master Agreement"), executed on May 1, 2006.[4]  That Agreement was intended to promote the use of the co-branded cards in Honduras, El Salvador, Costa Rica, Panama, and the Dominican Republic.  (Ex. 6, Master Agreement, Section Second).

On August 12, 2004, PriceSmart, its subsidiary PSMT Nicaragua, Banpro and Tecnicard entered into the Revised and Restated Agreement to Issue Co-Branded PriceSmart/Banpro Credit Cards in Nicaragua (the "Nicaragua Agreement") (made effective as of May 2, 2003) for use at the Nicaragua warehouse.  That Agreement provides that it "shall have a duration of two (2) years unless

---

[3]Promerica has bank branches within the warehouses, which were established through leases, only two of which had not expired as of the date of the hearing.

[4]That Agreement, which was modified through two amendments which do not substantively alter the terms except to extend the expiration date to April 30, 2007, provides, *inter alia*:

> **SEVENTH.  Cross-Access to database.**  Tecnicard, its subsidiaries, and affiliates will have access to PriceSmart Members' database for the purpose of approving and marketing the Dual Purpose Card.  PriceSmart, its subsidiaries, and affiliates will have access to Tecnicard's Customers' database for the limited purpose of marketing the Dual Purpose Card and facilitating PriceSmart retail promotions.  The access to the databases shall include the following member information, including but not limited to, name, citizen's id number or "Cedula", telephone number and mailing address and history of credit card usage.  The information included in this database shall be considered confidential.  The information from the respective databases will be used by Tecnicard to access the members' risk profile and by both parties to facilitate marketing plans for the Dual Purpose Card, ...

> **TWELFTH.   Confidentiality.**  Both parties agree to hold all confidential or proprietary information or trade secrets in trust and confidence and agree that it shall be used only for the purposes of this Agreement, and shall not be used for any other purpose or disclosed to any third party under any circumstances whatsoever, without the express written consent of the other party.

terminated earlier or extended by either party." (Nicaragua Agreement, Section Third).[5]

At some time prior to March 17, 2007, PriceSmart entered into an agreement with Credomatic, a competitor of Promerica, to issue co-branded cards. PriceSmart's Director of Software Development, David Hahn, was asked to compile membership information from

---

[5]That agreement provides, *inter alia*:

**SIXTH.  Cross-Access to database.**

　　　\*　　　\*　　　\*

**2.  Access to BANPRO Database:** PSMT-NC will have access to BANPRO's cardholders' personal information (name, home, and/or business address, telephone, etc.,) for the purpose of marketing the Card and facilitating PSMT-NC retail promotions. ...

**3.  Information in Databases.**  The database from each of the parties shall include at least the following Member information, including but not limited to; name, identification number, telephone number, mailing address, history of credit card usage and purchasing profile.  The information included in the database shall be considered confidential.  The information from the database will be used by the parties exclusively to facilitate the issuance and marketing of the Card.  Any other form of usage of this information must be clearly specify [sic] and authorized by the affected party (ies)

　　　\*　　　\*　　　\*

**TENTH.  Confidentiality.**  All Parties agree to hold all confidential or proprietary information or trade secrets in trust and confidence and agree that it shall be used only for the purposes of this Restated Agreement, and shall not be used for any other purpose or disclosed to any third party under any circumstances whatsoever.

The Agreement also contained paragraphs providing that "[i]f PSMT-NC decides to change its credit card acceptance policies, PSMT-NC will provide BANPRO of such decision with at least 45 days notice to give BANPRO the opportunity to present an Acquiring Business Proposal in accordance with the local Merchant Acquiring Practices." ¶ **FOURTH H.**  The termination provisions were similar to those contained in the Master Agreement.  ¶ **ELEVENTH**.

4

PriceSmart's AS400 membership database[6] for presentation to Credomatic. Hahn 246. On March 13, 2007, Mr. Hahn sent a data tape which included the following member information for the past two years: "the membership account number, the member account number, the individual cardholders in the account, the membership account type, the business name, the salutation, the first name, the last name, the member ID number, whether it is a voter registration card or a national I.D. number, the membership type, the address, postal code, country, phone number, e-mail address, business phone." Hahn 253. The following additional information was also transferred: gender, date of birth, occupation, number of dependents, date of card issuance and if the member had a co-branded card, which was indicated by a "flag." Id.[7] Mr. Hahn also provided information from PriceSmart's tender file (describing the type of payment used by the member). Hahn 255.

All of the identification information provided to Credomatic appears on the member's PriceSmart membership application, which is input into the AS400, other than the date of issuance of the card and whether the member had a co-branded card. Hahn 237, 255. The fact that a member had a co-branded card was entered into the AS400 from the PriceSmart point of sale machine, when a clerk typed in the first four and last five digits on the card, which would reveal the type of card and credit limit. Marin 457.[8]

---

[6]The AS400 captures information about the over 500,000 active membership accounts. In addition to personal information such as name, address, phone number, the AS400 captures sales activity including whether the member used cash, Visa, Master Card, Platinum Card, co-branded card, ATM, gift certificate, "Smart Points," check, etc.

[7]This "flag" of 27,046 members out of 605,623 members listed did not identify every co-branded cardholder, but only a minority. Hahn 249, 283-84. There are in excess of 1,000,000 members of PriceSmart. Hahn 265. About 25 percent of PriceSmart members in El Salvador, Honduras, Nicaragua and Costa Rica are Promerica customers. Laparte 338.

[8]Marcio Baltodano, Executive Vice President of Tecnicard, testified that Promerica transmitted to PriceSmart monthly certain co-branded card holder information which is considered confidential under the PSA. Baltondano 171-72; (Plf. Ex. 28 and 29). However, Jose Marin, Marketing Director for PriceSmart, testified that these forms were not uploaded into the AS400 System. Marin 409. Mr. Baltodano also testified that certain confidential credit information would have been entered into the AS400 System through a "swipe" of the credit card

On March 22, 2007, PriceSmart sent a letter to Promerica informing it that the applicable contracts were not being renewed and were being terminated due to Promerica's failure to comply with the "Success Criteria" paragraph under the Master and Nicaragua Agreements, with the exception of the possible renewal of the Master Agreement as it pertains to the Dominican Republic.[9]

The record contains an affidavit from Credomatic employee Teresa Mastrolinardo, dated May 7, 2007, in which she states, *inter alia*, as follows:

> **TWELFH:** ... CREDOMATIC has planned and, up until last Thursday, that is to say, the third (3rd) of May of the year two thousand seven (2007), has aggressively trained the personnel so as to implement a sales program using information from a data base for some credit accounts that I concluded and

---

on PriceSmart's point of sale machine. Baltadano 162-63. However PriceSmart representatives testified that PriceSmart's point of sales machine is not capable of receiving a swiped credit card. Marin 455, Hahn 258-59.

[9]The applicable paragraphs of the Master Agreement state as follows:

> **TENTH. Success criteria.** The Dual Purpose Card Program in each country will be considered successful for a specific country if it maintains a minimum penetration of twenty-five percent (25%) of all the credit card sales for that country. If this level of billing is not maintained in any given country, the Program may be terminated in that country at the sole discretion of PriceSmart, upon giving thirty (30) days written notice and subject to conditions stated in the Thirteenth paragraph below.

> **THIRTEENTH. Termination.** This Agreement will terminate:
> **A. For Cause:**
> > 1. At the discretion of PriceSmart if the goals established in Paragraph "Tenth: Success Criteria" are not achieved.
> > 2. At the discretion of the complying party if the other party breaches it obligations contained therein, and the complying party has demanded a cure of the breach, and the breaching party has not complied with its obligation within a term of fifteen (15) days after notification of the breach.

> B. Without Cause:
> > 1. By mutual agreement of the parties

The Nicaragua Agreement had already expired by its terms.

6

continue to conclude was from PROMERICA, in order for CREDOMATIC to transfer and take control of the maximum possible number of PROMERICA customers. This training has included explanations and instructions about how to use the personal information of the customers, as well as previously delivered contact information that I concluded and continue to conclude was from PROMERICA, for their PROMERICA dual-purpose credit cards. Specifically, my boss told me about two (2) weeks ago that, with PRICESMART's assistance, CREDOMATIC would soon be distributing this data base information to their sellers, which I conclude and continue to conclude was gathered and maintained by PROMERICA over a period of several years, concerning PROMERICA customers to whom dual-purpose Visa and PRICESMART membership cards were issued, so that we could call all their customers and offer to transfer their balances to our CREDOMATIC cards, as well as the continuity of their membership in the PRICESMART club.

\*      \*      \*

**FIFTEENTH:** I conclude that the data base that my boss, [JUVENTINO SCHAUER] promised to deliver from CREDOMATIC to me and other CREDOMATIC sellers in David was specifically PROMERICA's data base, because we were trained to offer a new program exclusively to PROMERICA's customers who had previously had dual-purpose credit cards for Visa and PRICESMART membership. Since the telemarketing was programmed and planned to sell to customers with these PROMERICA dual purpose cards and PROMERICA, logically, is the only company with all this data on their customers, I conclude that at the moment when JUVENTINO [SCHAUER] told me this, the data base that CREDOMATIC was going to use was going to be from PROMERICA.

Mastrolinardo Decl. ¶¶12, 15.

Mr. Schauer also submitted a sworn statement in which he states, *inter alia*, as follows:

**FOUR:** Towards the end of April this year, one Saturday we were visited at CREDOMATIC branch office in David, ... by a young woman working with CREDOMATIC Marketing Department in the city of Panama, Republic of Panama, to provide us with special training solely and exclusively intended to capture PRICESMART customers holding the PRICESMART dual credit card issued by PROMERICA. ... Then, on the following Monday, we went to PRICESMART offices located in the city of David, ... to obtain training from the Head of Marketing of PRICESMART in relation to PROMERICA customer portfolio. At the end of the meeting, the Head of Marketing of PRICESMART told us that PRICESMART would provide us with a **DATABASE** containing the details of PROMERICA confidential customers

who also operated with PRICESMART. ...

Schauer Decl. ¶4 (emphasis in original).  Jose Luis Laparte, President of PriceSmart testified that PriceSmart was aware that Credomatic was using the information provided to it to target Promerica's customers.  Laparte 367.

## Arbitration and Legal Proceedings

On April 30, 2007, PriceSmart, in response to letters received from Promerica, filed an arbitration proceeding seeking a declaration that it has not breached any agreement.  On May 16, 2007, PSC, Tecnicard, and Banpro filed an arbitration proceeding in Miami against PriceSmart, raising claims for breach of the pertinent contracts, and violation of Florida's Uniform Trade Secrets Act and Florida's Deceptive and Unfair Trade Practices Act.  Tecnicard and Banpro have also asserted similar claims under Nicaraguan law against PriceSmart in a related Nicaraguan Arbitration proceeding.

Also on May 16, 2007, Promerica originally filed this Emergency Motion in Dade County Circuit Court, requesting that the Court enter an Order (i) maintaining the status quo until Movants' claims have been disposed of by the arbitration panels, including prohibiting PriceSmart and Credomatic from engaging in unfair acts of competition by contacting Movants' customers and interfering with the Promerica Entities' leasehold interests; (ii) prohibiting PriceSmart from utilizing or dissemination Movants' confidential and proprietary information, including their commercial and trade secrets; (iii) depriving or interfering with the Promerica Entities' occupation and use of the unique leasehold interests in PriceSmart shopping clubs locations and (iv) directing PriceSmart to return or destroy any confidential and proprietary information, including trade secrets, it has obtained from Movants.

## DISCUSSION

### I.  Requirements for Injunctive Relief

The purpose of a preliminary injunction is "merely to preserve the relative positions of the parties until a trial on the merits [or here, an arbitration] can be held."  Alabama v. U.S. Army Corps

of Engineers, 424 F.3d 1117, 1133 (11th Cir. 2005), cert. denied, 126 S. Ct. 2862 (2006)(quoting

United States v. Lambert, 695 F.2d 536, 539 (11th Cir. 1983)).

      In order to be entitled to injunctive relief, the moving party must show: (1) a substantial

likelihood of success on the merits; (2) a substantial threat of irreparable injury if the injunction is not

granted; (3) that the threatened injury to the moving party outweighs the harm an injunction may

cause the non-moving party; and (4) that the injunction would not disserve the public interest. See

e.g. American Red Cross v. Palm Beach Blood Bank, Inc., 143 F.3d 1407, 1410 (11th Cir. 1998).

A preliminary injunction is an extraordinary remedy that should only be granted when the movant has

made a clear showing of its burden of proof. McDonald's Corp. v. Robertson, 147 F.3d 1301, 1306

(11th Cir. 1998); Café 207 v. St. Johns County, 989 F.2d 1136, 1137 (11th Cir. 1993). Furthermore,

when a plaintiff seeks to modify the status quo, as opposed to maintain it, courts have required the

plaintiff to make "a stronger showing of likelihood of success." See Cupolo v. Bay Area Rapid

Transit, 5 F. Supp. 2d 1078, 1085 (N.D. Cal. 1997).<sup>10</sup>

      Promerica claims that it has satisfied the criteria for a temporary injunction on three grounds:

(i) the improper use, misappropriation, and disclosure of Promerica's "confidential information"; (ii)

the unfair competition acts perpetrated by PriceSmart to unfairly influence the Promerica Entities'

customers to abandon them and join their competitor<sup>11</sup>; and (iii) the improper deprivation of, and

interference with, the Promerica Entities' unique leasehold interests and concomitant, exclusive

business interests.

### A. Misappropriation of Trade Secrets

      Florida law provides for injunctive relief to enjoin a party from misappropriating trade and

---

    <sup>10</sup>Because Promerica's Motion requests that this court place the parties back in the positions they occupied prior to the filing of the motion, when the credit card agreements were still in effect and no information had been shared with Credomatic. The Court will therefore hold Promerica to the higher standard.

    <sup>11</sup>Because PriceSmart stated at the hearing that it would enter into a stipulation with Promerica on this issue, the Court will not include this claim in its discussion.

commercial secrets. See Fla. Stat. § 688.003.[12]  Pursuant to Fla. Stat. §812.035, irreparable harm is presumed when a party appropriates or intends to appropriate trade secrets for its own use or the use of another unauthorized party as set forth in Fla. Stat. §812.081. Similarly, Nicaraguan law prohibits the unauthorized dissemination and exploitation of a commercial secret, prohibits acts of unfair competition, and allows the aggrieved party to enjoin the unauthorized conduct. See Nicaraguan Unfair Competition Statute, Arts. 106, 121-127, Nicaraguan Trade Libel Statute, Arts. 98, 104-107.

Promerica maintains that the "trade secret" or "commercial secret" which was allegedly misappropriated by PriceSmart is the information which was contained on the data tape Mr. Hahn transmitted to Credomatic, specifically the identification of some of its customers.[13]  Under Florida law, a "trade secret" includes information that: "[d]erives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use ... ."  §688.002(4), Fla.

---

[12]"Misappropriation" includes:

> (b) Disclosure or use of a trade secret of another without express or implied consent by a person who: ... 2. at the time of disclosure or use, knew or had reason to know that her or his knowledge of the trade secret was:
>
>  \*       \*       \*
>
>  b. Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or
>  c. Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; ...

Fla. Stat. § 688.002(2)(a), (b)1 and (b)2. Similarly, the Nicaraguan statute refers to "violating a non-disclosure clause resulting from a contractual ... agreement ..." Nicaragua Unfair Competition Statute, Art.123(a).

[13]Promerica also claims protection as to the identified customers' credit limits. Although there was evidence that PriceSmart had information pertaining to some of its members' credit limits in the AS400 system, there was no evidence that this information was passed on to Credomatic. Rather, only the identification of the member as a co-branded card holder was revealed.

10

Stat.[14]

This Court agrees that the names of Promerica's customers would be of value to Promerica's competitors, such as Credomatic, in that although these co-branded cardholders may not actually be the "best customers" of PriceSmart, as Promerica argues, they do represent a portion of a group of persons who are already considered to be credit worthy by at least one credit company. Mr. Keith testified that Promerica does not issue a credit card until it runs a credit check on the applicant and the credit is determined to be good, and that a "substantial amount" of applicants have been denied. Keith 100-01. He stated that "[t]he information that [Promerica] provide[s] is the byproduct of taking risk, going through an approval process, taking bad loans to losses, and that list has been refined over 8 years." Keith 123. This evidence supports Promerica's position that its creation of a subset of members who it believes are credit-worthy qualifies as a trade secret. See East v. Aqua Gaming, Inc., 805 So. 2d 932 (Fla. 2d DCA 2001); Mittenzwei v. Industrial Waste Svc., 618 So. 2d 328 (Fla. 3d DCA 1993); Unistar Corp. v. Child, 415 So. 2d 733, 734 (Fla. 3d DCA 1982) (finding customer list to be trade secret where list was "distillation of a larger list of financial planners, reflecting considerable effort, knowledge, time and expense on the part of the plaintiff"); compare Templeton v. Creative Loafing Tampa, Inc., 552 So.2d 288, 289 (Fla. 2d DCA 1989) (finding no trade secret where there was "no evidence that [advertiser and distribution lists] are the product of any great expense or effort, that they are distillations of larger lists, or that they include information not available from public sources.")

There was also testimony that Promerica takes steps to keep its list of customers confidential, including the provisions in the Master Agreement and Nicaragua Agreement which require that information which has defined this information as "confidential." This fact distinguishes this case

---

[14]Under Nicaraguan law, a trade secret is, *inter alia*, (i) information that "is not well known or readily ascertainable by any person normally in charge of the respective information" and (ii) that has been subject to reasonable measures to maintain its secrecy. See Nicaraguan Unfair Competition Statute, Art. 121.

from <u>Component Hardware Group, Inc. v. Trine Rolled Moulding Corp.</u>, No. Civ. A. 05-891(MLC), 2005 WL 1514190, at *37 (D.N.J. June 27, 2005) (noting that "[t]here is no contract or non-compete agreement between the parties that prohibits Trine from using its knowledge of customers' identities that it acquired during its relationship with Component.").[15]

PriceSmart argues that the information should not be considered a trade secret because it was possible for PriceSmart to determine the names of Promerica's customers from information PriceSmart employees input into PriceSmart's AS400 system. The Court finds that the fact that PriceSmart was able to input credit card numbers which identified members as Promerica customers does not mean this information is "readily ascertainable" by Promerica's competitors such as to prevent this information from being a "trade secret." <u>See</u> <u>A.L. Laboratories, Inc. v. Philips Boxane</u>, 803 F.2d 378, 381 (8th Cir. 1986) (noting that "a trade secret requires not absolute secrecy but 'a substantial element of secrecy * * * so that, except by the use of improper means, there would be difficulty in acquiring the information.'" (citing Restatement of Torts §757 comment b.), and approving jury instruction which stated that "[t]he fact that more than one company or enterprise has access to information does not necessarily prevent the information from being a trade secret. All that is required is that the information is not publicly known, and that it would be difficult or expensive for a competitor not lawfully possessed of the information to acquire it by fair means.")

However, even if Promerica has met its burden of showing a substantial likelihood that the names of its customers constitutes a trade secret, the Court is unable to fashion any appropriate injunctive relief. The Court has no information as to which of Promerica's customers have indeed been "targeted" by Credomatic and converted their credit cards due to the improper disclosure of their identities. Although the Court may order that the marketing program may not extend to the

---

[15]The names were revealed prior to the expiration and termination of the Master Agreement and prior to the termination of the Nicaragua Agreement.

"flagged" customers,[16] there is no way to "unring the bell" and have Credomatic's knowledge or use

of that information "erased." Enjoining the acceptance of all of Credomatic/PriceSmart cards would

not be appropriate, in that some cards may have been issued through a general offer to PriceSmart

members to persons who were not identified as Promerica customers by PriceSmart, but who happen

to be Promerica customers. Enjoining the acceptance of cards issued to the identified Promerica

customers would reveal the very information on which Promerica bases its request for relief. To the

extent that Promerica wants the Court to order PriceSmart to "return or destroy any confidential and

proprietary information, including trade secrets, it has obtained from Movants." the evidence showed

that the information which was shared with Credomatic was not obtained from Promerica, and any

other confidential information was validly obtained by PriceSmart pursuant to the Agreements. The

Court therefore finds that the court is unable to maintain the status quo by way of injunctive relief as

to the names already disclosed.[17]

As to Promerica's request to enjoin any future disclosure, assuming that its customer names

and credit limits constitute a trade secret, Promerica is basing its claim on "misappropriation" of that

information.  In order to establish misappropriation, Promerica must show that at the time of

disclosure, PriceSmart "knew or had reason to know that its knowledge of the trade secret was ...

[a]cquired under circumstances giving rise to a duty to maintain its secrecy or limit its use." §

---

[16]In addition to the testimony of Credomatic employees Ms. Mastrolinardo and Mr. Schauer, PriceSmart's Membership Marketing Vice President, Jose Marin, testified that PriceSmart and Credomatic are engaged in a "joint" program of marketing the new credit card. An injunction order would be binding on Credomatic, upon notice, to the extent that it is acting "in active concert or participation" with PriceSmart. Fed.R.Civ.P. 65(d). See Microsystems Software, Inc. v. Scandinavia Online AB, 226 F.3d 35, 43 (1st Cir. 2000) (explaining that a non-party who has "aided and abetted" the named defendant in the enjoined conduct may be held in contempt for violating injunction because "the existence of such a linkage makes it fair to bind the non-party, even if [it] has not had a separate opportunity to contest the original injunction, because [its] close alliance with the enjoined defendant adequately assures that [its] interests were sufficiently represented."

[17]Possibly during arbitration, the parties may investigate specifically which Credomatic cards were actually issued and what an appropriate damage award might be.

688.002(2)(b)2, Fla. Stat. In this case, the duty of PriceSmart to maintain the secrecy of Promerica's confidential information arises from the provisions of the Master Agreement and the Nicaragua Agreement.[18] It appears that these contracts were either terminated by PriceSmart, as further discussed below, or expired by their own terms, and there has been no showing that the duty to hold this information in confidence survived the contracts.[19]

The Court therefore finds that Promerica has failed to show that injunctive relief is appropriate with respect to information already disclosed, and has failed to show a substantial likelihood of success on the merits of its claim for further misappropriation of a trade secret.

### B.  Unfair Competition -Exclusive Right to Offer Banking/Credit Cards/Lease Space

Promerica claims that PriceSmart violated its "exclusive right to offer banking, credit card, and related services from the unique leased space in PriceSmart's warehouses so long as their rates and services were reasonable and competitive." Mot. p. 8 (citing SPA, §§1, 9.1, 9.2).

---

[18]The Court rejects PriceSmart's contention that "[t]he confidentiality agreements would necessarily be limited to information provided exclusively by plaintiffs and not otherwise available to PriceSmart" (Resp. p. 29). No such limiting language is contained in the confidentiality paragraphs - rather, the names of Promerica's customers are specifically defined to be "confidential" in the Agreements.

[19]Promerica argues that no law has been proffered that "the confidential nature of the information collected by the parties somehow metamorphosized into public information once the agreements either expired or terminated." Plf. Memo. p. 4. The burden is on Promerica, the maker of the motion, to show that the information has retained its confidential status. Promerica has not referred the Court to any case law which supports its position that PriceSmart's duty not to disclose this information survives the expiration/termination of the Agreements. Indeed, it would be an absurd result that the information would remain confidential indefinitely; for example, if Promerica were to go out of business, would PriceSmart still not be allowed to disclose the information? The case of Ackerman v. Kimball Int'l, Inc., 652 N.E.2d 507, 508 (Ind. 1995), cited by Promerica, is distinguishable in that (1) the defendant was a former employee of the plaintiff corporation, and (2) the defendant signed an agreement which stated that he would not disclose confidential information learned during his employment "at any time." See also Unistar Corp., 415 So. 2d at 734 (Fla. 3d DCA 1982) (noting that "the law will import into every contract of employment a prohibition against the use of a trade secret by the employee for his own benefit, to the detriment of his employer, if the secret was acquired by the employee in the course of his employment.")

Under the Florida Unfair and Deceptive Trade Practices Act, Fla. Stat. §§ 501.201 et seq., "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." See Fla. Stat. §501.204. Similarly, Nicaragua's Unfair Competition Statute declares that acts of unfair competition (defined as any act that is "contrary to the honest uses and practices of industrial or commercial exchange") are illegal. Nicaragua Unfair Competition Statute, Art. 121.

Relying on §9.1 of the SPA, John Keith, President of Banco America in Costa Rica, testified that prior to its termination, Promerica was ready to meet or beat Credomatic's proposal to PriceSmart, but it was wrongfully denied that opportunity. Keith 99, 105. PriceSmart argues that §9.1 does not apply for numerous reasons: (1) Promerica did not "provide goods or services for the warehouse stores," but rather was allowed to provide to PriceSmart members a dual purpose card (emphasis added); (2) a dual purpose card was not "necessary," but rather only convenient; (3) PriceSmart did not purchase anything from Promerica, but rather only licensed (for no fee) the use of its name to Promerica; (4) PSMT Caribe does not operate any warehouses in Nicaragua or Panama; (5) neither Banpro nor Tecnicard are shareholders of PSC (Keith 127); (6) the Master Agreement and Nicaragua Agreement contain integration clauses which supercede all other agreements, including the SPA; (7) Promerica did not provide any goods or services which were "to the standards required by PriceSmart" and (8) Promerica did not request Credomatic's competing offer.[20] Although Promerica offered cogent responses to the first two points, it failed to sufficiently counter the other arguments raised by PriceSmart as to the inapplicability of §9.1.

Alternatively, Mr. Keith testified that despite the lack of such language in the Agreements, he understood that Promerica's issuance of co-branded cards was "exclusive," (Keith 96), and that in the past, if PriceSmart was offered a competitive offer from another credit card issuer, the

---

[20]Additionally, although the Nicaragua Agreement provided that Banpro would have a "right of first refusal to be the Acquirer for all VISA cards at PSMT-NC warehouses (Nicaragua Agreement, ¶4H), that agreement has expired.

Promerica Entities determined whether they could meet or beat that offer, and in the past, they always

met the proposal. Keith 87. The Court finds that even if course of conduct is considered, there was

evidence of "cause" other than the terms of the offer upon which PriceSmart decided to terminate the

relationship. Promerica makes much of the fact that the termination letter cites to the failure to meet

the "penetration rate" criteria, and that PriceSmart could not really calculate that amount because

of the use of debit cards. The testimony was inconsistent on this point, and there were additional

reasons cited by PriceSmart for termination, including concerns about:

- member service levels;
- cardholder credit terms;
- inadequate card member incentives;
- conflicting philosophies regarding marketing events and strategies
- overall management of the credit card program; and
- "cannibalization of co-branded PriceSmart/Promerica card holders, to switch to competing Promerica credit cards"

Laparte Decl. ¶6. Mr. Laparte testified that even if Promerica had offered the same deal as it had

negotiated with Credomatic, PriceSmart still would not have continued on with Promerica because:

> after more than two years of having trouble, you get to the point that you just
> have to make a decision. And when you don't see things change, you have got
> to react, no, and that's the reason why we made the decision. It wasn't only the
> economics of the program because economically in terms of getting our people
> to work on a new program and having the members switch, that is not an easy
> thing, and all of that is a nightmare for us, but we needed to do that because at
> that point we lost the faith and the trust in the execution of the programs from
> Promerica. Through the years we noticed that they were not following what
> we expected.

Laparte 335. Mr. Laparte added that Promerica's lack of sense of urgency in resolving problems was

also an issue that led to the termination. Laparte 332.

With respect to providing banking services from the leased premises, Mr. Keith testified that

unnamed Promerica employees have been told (by unnamed persons) that they will be soon be

prohibited from entering the leased premises located inside the Costa Rica warehouse. Keith Aff. ¶

14. However, John Hildebrandt, PriceSmart's Executive Vice president declared that "PriceSmart

has not interfered with Promerica's occupancy of any of the bank branches" and that "PriceSmart has never informed (or has never taken the position) that Promerica must immediately vacate the bank branch premises contained in the PriceSmart stores." Hildebrandt Decl. ¶ 5.

Promerica did present as evidence a letter from PSMT Nicaragua, S.A. to Arturo Arana Ubieta, Executive President of Banpro, regarding the non-renewal of the lease at the warehouse in Nicaragua. Pf. Ex. 32. However, as PriceSmart points out, §9.2 only applies to countries listed in that agreement, and Nicaragua is not one of those countries.

Promerica has also submitted the Declaration of Jose Cerdas, who states that on July 31, 2007 he observed that Credomatic Automatic Teller Machines ("ATMs") had been installed at PriceSmart's Costa Rica store. See also Cerdas Decl. Such action would not interfere with Promerica's leasehold interest or its ability to provide banking services, and the SPA does not provide Promerica with exclusive rights, as it suggests. The course of conduct argument has already been rejected, as discussed above.

### C. Conclusion

Accordingly, the Court finds that (1) with respect to the customer names which have already been disclosed, although Promerica has shown a substantial likelihood of success on the merits as to misappropriate of a trade/commercial secret, a damages award may be appropriate but injunctive relief is not; and (2) with respect to the disclosure of any additional information, and any acts of unfair competition, Promerica has failed to show a substantial likelihood of success on the merits. Accordingly, it is hereby **ORDERED AND ADJUDGED** that the Emergency Motion for Temporary Injunction is hereby **DENIED**.

**DONE AND ORDERED** this _18__ day of September, 2007, at Miami, Florida.

STEPHEN T. BROWN
U.S. MAGISTRATE JUDGE

17